UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESTHER V., | ) |
| Plaintiff, | ) No. 19-cv-8093 |
| v. | ) Magistrate Judge Susan E. Cox |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Esther V.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability benefits. The parties have filed cross motions for summary judgment.[2] As detailed below, Plaintiff's motion for summary judgment [dkt. 12] is DENIED and Defendant's motion for summary judgment [dkt. 21] is GRANTED. The final decision of the Commissioner denying benefits is affirmed.

1. **BACKGROUND**

    1.1 **Procedural History**

Plaintiff protectively applied for disability and disability insurance benefits in September 2016, alleging she became disabled on August 24, 2016. [Administrative Record ("R.") 13.] Plaintiff was born in 1981, making her 35 years old on the alleged disability onset date. [R. 23.] Plaintiff's applications were denied initially and upon reconsideration. *Id*. Plaintiff appealed those denials and appeared at an August 8, 2018 Administrative Hearing before Administrative Law Judge ("ALJ")

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

[2] Although not styled as a motion for summary judgment, "Defendant's Response to Plaintiff's Motion for Summary Judgment" [dkt. 21] seeks summary judgment in its *ad damnum* paragraph and, therefore, the Court construes it as a motion for summary judgment.

Edward P. Studzinski. [R. 31-55.] On November 21, 2018, ALJ Studzinski issued an unfavorable decision, concluding that Plaintiff had not established she was disabled during the period from her onset date through the date of the ALJ's decision. [R. 13-24.]

Plaintiff requested Appeals Council review, which was denied on October 7, 2019. [R. 1-6.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. 20 C.F.R. §404.981. Plaintiff, through counsel, filed the instant action on December 11, 2019, seeking review of the Commissioner's decision. [Dkt. 1.]

### 1.2 Relevant Medical Background

In October 2015, when Plaintiff was three months pregnant, her obstetrician referred her to psychiatry for increased anxiety. [R. 249.] On October 26, 2015, Plaintiff underwent an initial evaluation with Jessica Dube, APN. *Id.* At that time, Plaintiff reported that she had a lifelong history of anxiety, with her biggest panic trigger being the car (she reported panicking at red lights, especially in the far left turn lane). *Id.* She also reported panic attacks at the grocery store. *Id.* Examination revealed Plaintiff had multiple symptoms of anxiety, including fatigue, nervousness, restlessness, difficulty concentrating, irritability, sleep disturbance (Plaintiff reported she sometimes awoke with a panic attack), and muscle tension. *Id.* Nurse Dube diagnosed her with generalized anxiety disorder and panic disorder with agoraphobia, strongly advised Plaintiff to schedule therapy to learn anxiety and panic reduction techniques, and prescribed the antidepressant Zoloft. [R. 249, 252.] Plaintiff also reported to Nurse Dube "[s]he believes she will not take medication for anxiety if prescribed it, but will consider it." [R. 249.]

The following month Plaintiff presented for an initial evaluation with psychologist Dr. Kristyn Funasaki-Fiene, Ph.D. [R. 254.] Plaintiff reported to Dr. Funasaki-Fiene the Zoloft helped decrease her panic attacks. *Id.* One month later, in mid-December 2015, Plaintiff reported things were going well with her anxiety and she had not had any panic attacks recently. [R. 257.] However, other records

indicate Plaintiff stopped taking Zoloft "after a few days of taking it" due to her pregnancy. [R. 301.]

In August 2016, after the birth of her child, Plaintiff presented to her primary care physician, Dr. Steven Harnrack, M.D., with generalized anxiety. *Id.* Dr. Harnrack reinitiated Zoloft, and recommended Plaintiff reestablish treatment with her psychologist. *Id.*

On September 22, 2016, Plaintiff returned to Dr. Funasaki-Fiene for therapy. [R. 303.] She reported increased panic attacks and fear when making left turns while driving. *Id.* She reported recently restarting Zoloft and that it helped, but her mood and affect were noted to be tired and frustrated. *Id.* Dr. Funasaki-Fiene diagnosed Plaintiff with generalized anxiety disorder and panic disorder with agoraphobia. *Id.* October 28, 2016, Plaintiff reported interpersonal and familial difficulties. [R. 305.] She also indicated "she still has anxiety related to driving, which she is still trying to push herself to practice exposure therapy." *Id.* In December 2016 and January 2017, Plaintiff reported, in large part, that she had been feeling more stressed, anxious, and depressed recently due to multiple familial stressors. [R. 307, 451.] In March 2017, Plaintiff reported feeling more anxious, and that her anxiety and not wanting to go out was affecting her marriage. [R. 500.] Dr. Funasaki-Fiene's diagnoses of anxiety disorder and panic disorder with agoraphobia remained the same. *Id.*

On April 19, 2017, Plaintiff presented for an initial examination with Dr. Ashmad Bashir, M.D., a psychiatrist. [R. 505.] Dr. Bashir noted that Plaintiff reported noncompliance with her medications, using her Zoloft "off and on," and her Xanax "3-4x a week." *Id.* She reported anxiety, irritability, worry, restlessness, and avoidance of leaving the home. *Id.* Plaintiff reported having anxiety attacks three to four times a week, lasting 30 to 60 minutes, with shortness of breath, palpitations, sweatiness, shaking, and dizziness. *Id.* Examination revealed "low" mood. [R. 508.] Dr. Bashir diagnosed Plaintiff with "major depressive disorder, recurrent episodes, moderate; R/O persistent depressive disorder (dysthymia); generalized anxiety disorder; specific phobia (heights);

3

panic disorder with agoraphobia; and R/O social anxiety disorder."[3] *Id*. Dr. Bashir adjusted Plaintiff's medications, and encouraged better medication compliance and continued psychotherapy. *Id.*

On June 20, 2017, Plaintiff reported medication compliance to Dr. Bashir, yet still reported feeling anxious most of the time and worrying excessively. [R. 510.] Examination revealed a sad mood, but logical thought process and fair attention. [R. 512.] Dr. Bashir again adjusted Plaintiff's medications (replacing Zoloft with a different antidepressant, Celexa) and endorsed his previous diagnoses. [R. 503.] Eight days later, Plaintiff had a visit with Dr. Funasaki-Fiene, at which she reported a high level of anxiety, as well as frustration in her marital relationship. [R. 515.] She reported not yet having started taking Calexa. *Id*. Dr. Funasaki-Fiene counseled Plaintiff "about starting on the Celexa, as prescribed by Dr. Bashir and to make more regular appointments with [Dr. Funasaki-Fiene] in order to learn additional anxiety reducing strategies…" *Id*. In July 2017, Plaintiff reported to Dr. Bashir she was doing better despite facing the same stressors, and reported difficulty sleeping and low energy. R. 517-520. Dr. Bashir increased her Celexa and prescribed a sleep aid. *Id.* On August 24, 2017, Plaintiff indicated to Dr. Funasaki-Fiene she was trying to go to the gym to help reduce her anxiety, and that she recently quit a job that increased her anxiety.[4] [R. 522.]

Dr. Bashir's notes from September 2017 to June 2018 indicate that Plaintiff was, in large part, doing "okay," "fairly," or "so so." [R. 526, 529, 537, 540, 544, 547, 553, 556, 564, 567, 585, 588.] Dr. Funasaki-Fiene's notes from this time period describe Plaintiff as 'stable" and largely discuss how "she has been trying her best to manage her anxiety." [R. 531, 535, 542, 549, 562, 570, 576, 578, 583, 591.] On June 23, 2018, Plaintiff reported to Dr. Funasaki-Fiene "she has been more able to push through her anxiety and is happy about this" and reported that she was leaving the house at least once

---

[3] R/O is an abbreviation for rule out. *Stedmans Medical Dictionary*, R/O, 788150.

[4] The Court notes that this report of having and quitting a job comes a full year after Plaintiff alleges she became disabled. [R. 13.]

4

a week to do something. [R. 591.]

On July 9, 2018, Dr. Funasaki-Fiene completed a Mental Residual Functional Capacity Statement. [R. 604-607.] Dr. Funasaki-Fiene endorsed diagnoses of generalized anxiety disorder and panic disorder with agoraphobia, and noted that these were chronic, permanent conditions that affect Plaintiff daily. [R. 607.] Among other things, she assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 45, and indicated that, based upon her clinical observations and evaluations, Plaintiff's GAF score had not been higher than 50 in the past year.[5] *Id.* Dr. Funasaki-Fiene also opined that Plaintiff "is fully <u>incapable</u> of acquiring and maintaining a job currently and in the future." [R. 604-07 at 606 (emphasis in original).]

### 1.3 The ALJ's Decision

At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 24, 2016. [R. 15.] At Step 2, the ALJ found that Plaintiff had the severe impairments of anxiety and depression. *Id*. The ALJ determined that Plaintiff's obesity was a non-severe impairment. [R. 15-16.] At Step 3, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 16-17.] Before Step 4, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at all exertional levels with the following limitations: no concentrated exposure to noise beyond a typical office environment; work in only non-hazardous environments; simple, routine tasks with no more than

---

[5] Although the Global Assessment of Functioning ("GAF") is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, 2015 WL 7180092 at *1 (N.D. Ill. Nov. 16, 2015). The lower the GAF score, the greater the degree of impairment. *Id*. A score between 41 and 50 indicates "serious symptoms" such as suicidal ideation, severe obsessional rituals, or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work)." A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id*. Anything above 60 would indicate mild symptoms. *Id*.

simple decision-making and judgment, and no more than occasional and minor changes in work setting; no multi-tasking; work at only an average production pace, with no work requiring significant self-direction; no direct public service; only brief and superficial interaction incidental to job duties (with public, co-workers, or supervisors); no crowded or hectic environments; and no teamwork or tandem tasks. [R. 17.] At Steps 4 and 5, the ALJ found Plaintiff incapable of performing her past relevant work, but that other jobs existed in significant numbers in the national economy that Plaintiff would be able to perform. [R. 22-24.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 24.]

**2.      SOCIAL SECURITY REGULATIONS AND STANDARD OF REVIEW**

ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment (or combination of impairments) meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 404.1523; 20 C.F.R. § 404.1545; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to

perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

The Court's scope of review here is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation and signals omitted). The Court reviews the ALJ's decision directly, but plays an "extremely limited" role in that the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute (its) own judgment for that of the Commissioner." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted).

### 3. DISCUSSION

Plaintiff raises five issues with the ALJ's opinion: (1) that the ALJ failed to account for certain impairments at Step 2 of his decision; (2) that the ALJ erred in the paragraph B analysis at Step 3 of his decision; (3) that the RFC improperly accommodated Plaintiff's functional deficits; (4) that the ALJ improperly assessed Plaintiff's subjective allegation; and (5) that the ALJ improperly rejected the opinion of a treating physician.

#### 3.1 No Error at *De Minimis* Step 2 Screening

At the second step of the sequential evaluation process applicable to Social Security disability claims, an ALJ must consider whether the claimant has a severe medically determinable impairment

that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). Step 2 has been classified time and time again by the Seventh Circuit as "a *de minimis* screening for groundless claims." *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016) (citing *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697, 2016 WL 4197915, at *6 (7th Cir. Aug. 9, 2016); *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)) (signals and additional citations omitted); *see*, *also*, *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (Step 2 is "merely a threshold requirement") (citation omitted). Therefore, "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castile*, 617 F.3d 923, 926-27 (7th Cir. 2010). If an ALJ finds even one severe impairment at Step 2, any error of omission is harmless. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *2 (N.D. Ill. May 31, 2019) ("any error at step two is harmless if the ALJ finds a claimant has *any* severe impairment and goes on to sufficiently address the aggregate effect of all the claimant's severe and non-severe impairments later in his analysis.") (emphasis in original) (citations omitted).

In the instant matter, the ALJ determined Plaintiff suffered from the severe impairments of anxiety and depression. [R. 15.] Yet Plaintiff faults the ALJ for not finding Plaintiff's panic disorder and agoraphobia as severe. However, the fact the ALJ found some severe impairments but not others is indeed a favorable Step 2 finding and, thus, it was proper for the ALJ to proceed to Step 3 of the analysis. *Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015) (a severe impairment finding was "as favorable a determination as can be made at Step 2"). In short, Plaintiff has failed to demonstrate error with the favorable Step 2 finding for Plaintiff. Moreover, by Plaintiff's own admission, the ALJ "repeatedly acknowledged that Plaintiff had been diagnosed with panic disorder with agoraphobia" throughout the decision. [Dkt. 12, p. 9; R. 19-20, 22.] So, even if the ALJ's failure to classify Plaintiff's panic disorder and agoraphobia as severe was error (the Court does not hold it is, and Plaintiff actually agrees [dkt. 22, fn. 1]), any error is harmless, as the ALJ has acknowledged these

8

diagnoses exist and goes on to analyze the impact of these impairments on Plaintiff's functioning. The Court will not remand on this basis.

### 3.2 The ALJ Appropriately Weighed the Paragraph B Evidence

Next, Plaintiff argues she met or equaled listing level severity and, thus, the ALJ should have found her disabled at Step 3. [Dkt. 12, pp. 9-11.] The Court disagrees.

The medical criteria for the listings are set at a higher level than the statutory disability standard because the listings are "designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Ronald B. v. Berryhill*, 2019 WL 2173776, at *2 (N.D. Ill. May 20, 2019). To determine whether a mental impairment meets or equals listing level severity at Step 3 of the sequential analysis, a plaintiff must prove she meets the severity criteria of either paragraph B or C.[6] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. To satisfy the paragraph B criteria, a plaintiff must demonstrate an "[e]xtreme limitation of one, or marked limitation of two" of four areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. *Id*.

Plaintiff bears the burden of proving that her "impairments satisfy all of the various criteria specified in the listing."[7] *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2005); *see also* 20 C.F.R.

---

[6] Plaintiff does not argue she satisfied the paragraph C criteria, or dispute the ALJ's finding that she did not. [Dkt. 12, pp. 9-11.] Consequently, she has waived any such argument. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020) (arguments not raised in district court are waived); *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (arguments not raised in party's opening brief are waived).

[7] In addition to her main arguments under this subheading, Plaintiff also argues she meets Listing 12.06 because she has demonstrated fear or anxiety in more than two situations (*i.e.*, making turns from the left lane and leaving the home for any reason). [Dkt. 12, p. 9, 13.] This is because, according to Plaintiff, "just two situations that trigger disproportionate panic would alone be sufficient to satisfy listing 12.06." [Dkt. 12, p. 13.] Plaintiff is incorrect. While this may be enough to satisfy the paragraph A criteria for Listing 12.06, Listing 12.06 plainly requires that a claimant must satisfy the paragraph B or paragraph C criteria, *in addition to* the criteria in paragraph A. 20 C.F.R. Pt. 404, Supbt. P, App. 1, § 12.00(A)(2); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Plaintiff has not demonstrated she meets *all* the criteria of Listing 12.06, and this argument fails.

§ 404.1525(d). To support reversal, "a claimant is required to identify the medical evidence showing that he or she would have satisfied the Step 3 criteria if the ALJ had considered the relevant issues." *Heuschmidt v. Colvin*, 2015 WL 7710368, at *3 (N.D. Ill. Nov. 30, 2015).

In this case, the ALJ weighed the record evidence of Plaintiff's functioning in each of the paragraph B areas and concluded she did not satisfy a mental impairment listing because the evidence overall supported finding only moderate limitations. Plaintiff vigorously disagrees with how the ALJ weighed these criteria, accusing the ALJ of drawing "false equivalencies" and making "leaps of logic" by weighing her allegations of limitations against other record evidence demonstrating her functional abilities. [Dkt. 12, pp. 9-11.] However, "vigorous assertions do not carry the day" and "saying so doesn't make it so." *Migdalia M. v. Saul*, 414 F. Supp. 3d 1126, 1134 (N.D. Ill. Oct. 28, 2019). The ALJ considered Plaintiff's subjective reports of limitations – the same evidence Plaintiff cites (*i.e.*, panic attacks while driving; fear of heights, elevators, bridges, driving in the left lane, and turning left; being unable to pay bills on time; difficulty getting along with family and friends because they do not understand why she does not want to go out; and self-isolation [*compare* R. 16-17 *with* dkt. 12, pp. 10-11]) – and weighed them along with relevant record evidence of Plaintiff's functioning in making a judgment about Plaintiff's degree of restriction in each paragraph B area. [R. 16-17.]

Specifically, in the area of understanding, remembering, or applying information, while the ALJ acknowledged that although Plaintiff forgets to pay the bills on time because she "stresses too much," Plaintiff also reported she does pay the bills,[8] uses a checkbook, handles household chores, cooks, shops, takes care of the children, provides accurate information to healthcare providers, and drives (despite her acknowledged fear of it).[9] [R. 16.] The ALJ also mentioned the record contains

---

[8] The ALJ noted both Plaintiff's self-report that she pays bills, as well as Plaintiff's husband's testimony that Plaintiff does not pay bills because she was forgetting to pay them on time due to stress. [R. 16.]

[9] Plaintiff testified she herself drives "[a]pproximately once or twice a week." [R. 39.]

10

"little mention of issues with the [Plaintiff's] short- or long-term memory." *Id*. In the area of interacting with others, the ALJ balanced Plaintiff's reported difficulty getting along with others due to others not understanding why she does not want to go out, with, *inter alia*, attending church weekly; shopping, spending time with family and friends; dealing appropriately with authorities, living with others; socializing and driving with encouragement; and interacting with non-medical staff. *Id*. In the ability to concentrate, persist, or maintain pace, the ALJ noted that although Plaintiff reported difficulties in focusing generally and completing tasks due to her anxiety and depression, Plaintiff also rereported she is able to concentrate enough to use a checkbook and watch TV programs. *Id*. The ALJ also highlighted how the medical record also "fail[ed] to show much mention of distractibility and/or an inability to complete testing that assesses concentration and attention." *Id*. In the area of adapting or managing oneself, the ALJ first mentioned Plaintiff "did not allege any symptoms or limitations that relate to this criterion," before noting the record corroborated Plaintiff's self-report that she is able to handle self-care and personal hygiene. [R. 17.] The ALJ also noted Plaintiff is able to cook, clean, and help care for the children, and had no reported problems with temper control or getting along with staff. *Id*. Finally, the ALJ did acknowledge that Plaintiff "reported having a fear of heights, elevators, driving in the left lane, and turning left," but also noted that if a panic attack occurs during these activities, Plaintiff used deep breathing and cognitive behavior therapy techniques to remedy the attack.[10] [R 17-18.] The ALJ also mentioned that Plaintiff is capable of removing herself from a situation (and has done so) if she has a panic attack when she is out shopping, for example. [R. 19.]

    This is precisely the sort of evidence the regulations instruct ALJs to consider at Step 3. *See*

---

[10]   "We do not discount [an ALJ's discussion of the evidence] simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant." *Curvin*, 778 F.3d at 650; *Rice v. Barnhart*, 384 F.3d 363, n. 5 (7th Cir. 2004) (as courts read ALJ decisions as a whole, it would be a "needless formality" to require ALJs to repeat redundant discussions of evidence that appear elsewhere in the decision).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F3 (in rating degree of limitation, ALJs consider all relevant medical and non-medical evidence, as well as the claimant's activities). The ALJ considered Plaintiff's subjective reports of limitations and weighed them along with relevant record evidence of Plaintiff's functioning in making a judgment about Plaintiff's degree of restriction in each Paragraph B area. The ALJ's analysis here has adequate support. While there may be other evidence that could support/disprove any of the ALJ's conclusions in his Paragraph B analysis, this is a question of weighing the evidence. "Even if reasonable minds could differ here concerning whether these facts correlate to the result obtained by the ALJ, whether the ALJ was correct in [his] analysis, or whether Plaintiff might ultimately be disabled, such other reasonable minds might disagree and believe the opposite." *Jessica K.*, 2020 WL 4015330, at *7 (N.D. Ill. July 16, 2020). As in all Social Security disability cases, "there are positive signs and negative signs regarding plaintiff's capabilities in [various] area[s]; these were conflicts that the ALJ had to resolve." *Shaun R. v. Saul*, 2019 WL 6834664, at *5 (N.D. Ill. Dec. 16, 2019). Here, the Court finds the ALJ properly "engaged with both sides of the record," and Plaintiff cannot establish error simply because the ALJ "weighed the evidence in a different way than plaintiff would have liked." *Bertha M. v. Saul*, 395 F. Supp. 3d 963, 972 (N.D. Ill. Sept. 17, 2019). The Court finds the ALJ's analysis and explanation constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett*, 381 F.3d at 668. Therefore, the Court must affirm the ALJ's decision as having adequate Paragraph B support. *Elder*, 529 F.3d at 413 (even if reasonable minds could disagree, court must nevertheless affirm denial of benefits if adequately supported). The Court will not remand on this basis.

### 3.3 The ALJ Appropriately Accommodated Plaintiff's Mental Limitations in the RFC

Plaintiff's third disagreement with the ALJ's opinion centers around the ALJ's treatment of Plaintiff's mental limitations in the residual functional capacity finding.

In this case, the ALJ found Plaintiff had the residual functional capacity to perform work at all exertional levels, but with several accommodations (*i.e.*, environmental, task, and production limitations, as well as social restrictions) to account for her mental limitations. [R. 17.] Specifically, the ALJ provided for no concentrated exposure to noise beyond a typical office environment and only non-hazardous environments. *Id*. He limited Plaintiff to only simple, routine tasks with no more than simple decisions and judgments and only occasional and minor changes in work setting. *Id*. The ALJ restricted Plaintiff to an average production pace, with no work requiring above-average or variable production pace, and no work requiring significant self-direction. *Id*. He precluded work involving direct public service and limited Plaintiff to only brief and superficial public interaction incidental to job duties and no crowded or hectic environments. *Id*. Finally, the ALJ included RFC restrictions to only brief and superficial interactions with co-workers and supervisors, with no teamwork or tandem tasks. *Id*.

As the Seventh Circuit has recognized, the "determination of a claimant's RFC is a matter for the ALJ alone" to decide. *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). In assessing Plaintiff's RFC here, the ALJ gave great weight to the opinions of the psychologists who reviewed the record at the initial and reconsideration levels, Drs. Tin and Cochran. [R. 22, 58-61, 67-69.] The ALJ noted that these psychologists had considered Plaintiff's allegations of increased symptoms, but nonetheless found she could perform work with modified social demand. [R. 22, 67.] In fact, Drs. Tin and Cochran actually concluded, after reviewing Plaintiff's symptom allegations and the medical treatment findings, that Plaintiff's mental impairments were non-severe. [R. 58-61, 67-69.] Nevertheless, the ALJ noted he had provided for the numerous RFC limitations detailed in the previous paragraph after reviewing the hearing-level record. [R. 22.] The ALJ's RFC finding that "was more limiting than that of any state agency doctor" illustrates that the ALJ gave "reasoned consideration…to the evidence" Plaintiff presented. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The Court finds the

13

ALJ's RFC and accompanying reasoning to be well-supported and adequate to support his conclusions (*i.e.*, supported by substantial evidence). *Barnett*, 381 F.3d at 668.

While Plaintiff takes issue with the ALJ's consideration of her limits, and thrice reiterates "there is no evidence to support this" related to the ALJ's RFC analysis [dkt. 12, p. 12], Plaintiff offers no additional RFC restrictions the ALJ allegedly should have included. Moreover, the only record evidence Plaintiff points to that any additional restrictions might be necessary was the Mental Residual Functional Capacity Statement filled out by Plaintiff's treating psychologist, Dr. Kristyn Funasaki-Fiene. [Dkt. 12, p. 13; R. 604-07.] The ALJ only gave limited weight to this Statement by Dr. Funasaki-Fiene, as he found "that the objective record does not at all support" the doctor's opinion that (in Plaintiff's words) "Plaintiff would have significant difficulties in sustaining proper interactions and completing tasks on a full time basis." [R. 22; dkt. 12, p. 13.] (The Court addresses how the ALJ properly discounted this Statement further in Section 3.5, *infra*.) As Plaintiff has not met her burden of proving her specific functional restrictions, the Court cannot remand in light of the fact there are no identified "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) (it is plaintiff's burden, not ALJ's, to prove specific functional restrictions).

The Court will not remand this matter based on the ALJ's RFC analysis.

### 3.4 The ALJ Properly Assessed Plaintiff's Subjective Statements

Plaintiff's next argues the ALJ's treatment of her subjective symptoms was unsupported. The Court disagrees.

Social Security regulations require ALJs to consider whether a claimant's allegations of limitations are consistent with their daily activities. 20 C.F.R. § 404.1529(c)(3)(i). Specifically, ALJs are required to consider whether objective medical evidence, and the claimant's course of treatment,

supports a claimant's allegations about the severity of her symptoms. 20 C.F.R. § 404.1529(c)(2) and (c)(3)(v). As the Seventh Circuit has recognized, "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'" *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)). The court's review of an ALJ's assessment of a claimant's subjective statements is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). If "an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin*, 778 F.3d at 651. The ALJ's analysis of a claimant's allegations does not need to be flawless: "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Only when an ALJ's assessment "lacks any explanation or support…will [the court] declare it to be 'patently wrong.'" *Elder*, 529 F.3d at 413-14.

Accordingly, the ALJ considered Plaintiff's activities in the context of weighing whether "the evidence…support[s] the amount of disabling allegations the claimant reported." [R. 19]. The ALJ explained how he considered and compared Plaintiff's complaints of limitations with the medical treatment records and found that the overall record did not support a finding of disability. [R. 19-21.] Specifically, the ALJ noted that Plaintiff's psychological exams "were always essentially normal in terms of her thought content and process; but her mood always varied. Despite medication, she has continued to have anxiety due to family issues."[11] [R. 21; *see, also*, R. 254, 257, 305, 447, 500, 512, 522, 567, 591.] Additionally, the ALJ considered Plaintiff's testimony that her social life had "declined in the last few years due to her panic attacks," and found that while the record showed some

---

[11] Plaintiff argues the ALJ mischaracterized her exams as "essentially normal." [Dkt. 12, p. 14.] The Court does not find this to be the case. The Court has thus quoted the ALJ's exact language above, as it is a more fulsome representation of the content of the records than Plaintiff contends.

15

reduced social interaction, Plaintiff's symptoms later improved to the point where she went to social events, attended church, spent time with other moms, and went to the gym. [R. 19; *see*, *also*, R. 192, 522, 549, 562, 591.] The ALJ further noted that Plaintiff had "mostly described a fear of driving, crowds, heights, etc." [R. 21.] Finally, Plaintiff points out that her mood varied and she continued to have anxiety, but the ALJ directly acknowledged these findings brought up by Plaintiff and he explained he limited plaintiff's RFC accordingly (*e.g.*, no driving at work or unprotected heights; no crowds or hectic places; and only brief and superficial social interactions, in addition to many other mental restrictions). [R. 17, 21.] The Court finds these to be "specific reasons supported by the record" for the ALJ's treatment of Plaintiff's subjective statements and the accommodations he crafted based on them. *Curvin*, 778 F.3d at 651.

Plaintiff has not shown the ALJ erred in his consideration of Plaintiff's recitation of her limitations compared to the medical evidence or her course of treatment. Instead, Plaintiff again presented issues with how the ALJ weighed this evidence. However, again, it is the ALJ's purview to resolve the conflict between the positive and negative evidence in the record. *Shaun R.*, 2019 WL 6834664, at *5. The Court does not find it "patently wrong" for the ALJ to have "tailor[ed] an RFC that fit her limitations, though not necessarily the intensity to which she testified." *Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019). The Court will not remand on this basis.

### 3.5 The ALJ Properly Discounted the Opinion of Plaintiff's Treating Psychologist

Finally, Plaintiff argues the ALJ erred in giving little weight to the opinions of Dr. Funasaki-Fiene, Plaintiff's treating psychologist, who opined in her July 9, 2018 Mental Residual Functional Capacity Statement that Plaintiff has multiple extreme limitations and "is fully incapable of acquiring and maintaining a job currently and in the future." [R. 604-07 at 606.] The Court finds no error with the ALJ's assessment of Dr. Funasaki-Fiene's opinions.

First, the Court notes that while the ALJ erred in stating that Plaintiff's "treatment history was

quite brief at the time the form was completed," the ALJ elsewhere acknowledged the actual longevity of Plaintiff's treatment history with Dr. Funasaki-Fiene and, thus, this error is harmless.[12] *Curvin*, 778 F.3d at 650 ("We do not discount [an ALJ's discussion of the evidence] simply because it appears elsewhere in the decision.").

The ALJ acknowledged that Dr. Funasaki-Fiene was a treating physician, but concluded the marked restrictions she endorsed were inconsistent with Plaintiff's improvement documented in treatment notes, unsupported by predominantly normal findings in Dr. Funasaki-Fiene's own notes, and plainly inconsistent with the record evidence showing Plaintiff regularly socialized and engaged in activities. [R. 22.] The ALJ found Dr. Funasaki-Fiene's statements about social interaction and occasional inability to leave her house inconsistent with Plaintiff's own reports of her degree of activity. *Id*. Referencing his earlier discussion of the treatment records, the ALJ found Dr. Funasaki-Fiene's extreme restrictions inconsistent with the longitudinal improvement documented in the treatment records. [R. 19-22.] This degree of limitation was also unsupported by Dr. Funasaki-Fiene's own treatment notes which, again, were essentially normal in terms of thought content and process with variation in mood and anxiety secondary to family issues. [R. 21; *see*, *also*, R. 254, 257, 305, 447, 500, 512, 522, 567, 591.] And contrary to Dr. Funasaki-Fiene's opinion that Plaintiff was "at times unable to leave her house due to crippling anxiety and agoraphobia" [R. 606], the ALJ found the record showed Plaintiff engaged in a range of activities and socialized, including attending appointments, shopping, attending a mom's group, attending church, and going to the gym. [R. 22; *see*, *also*, R. 192, 522, 549, 562, 591.]

Additionally, the ALJ also discounted Dr. Funasaki-Fiene's specific opinion that Plaintiff "is

---

[12]   *Compare* R. 22 ("treatment history was quite brief at the time the form was completed") *with* R. 19 (Dr. Funasaki-Fiene evaluated Plaintiff for the first time on November 17, 2015); R. 20 (Plaintiff next saw Dr. Funasaki-Fiene over 16 months later on March 22, 2017, as well as in June of 2017); R. 21 (Plaintiff saw Dr. Funasaki-Fiene on August 24, 2017 and thereafter had monthly visits with her; the ALJ noted specific items from these monthly visits for the March 29, 2018 and June 23, 2018 visits).

17

fully incapable of acquiring and maintaining a job currently and in the future."[13] [R. 22 (citing R. 606.] The ALJ noted that this "opinion appears to be based more on subjective allegations made by the claimant" than evidence of record. [R. 22.] Plaintiff takes issue with this "undermining" of Plaintiff's panic attacks, but this is not a remandable error, as an ALJ is permitted to consider the extent to which a treating physician's limitations are based on the claimant's subjective reports rather than objective findings. *See Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (treating physician's opinion may be properly discounted if based upon claimant's subjective complaints rather than objective medical evidence); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (ALJ properly discounted medical opinion "that rests entirely on the claimant's subjective complaints."); *Rice*, 384 F.3d at 371 ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to [a] citation of a claimant's subjective complaints."). Moreover, the ALJ himself noted that "[i]t is not necessary that medical personnel observe a claimant's panic attacks, but the fact that no personnel [have] is *one of many factors* suggesting they may not have been as frequent and severe as alleged." [R. 22 (emphasis added).] The ALJ did not simply reject this opinion of Dr. Funasaki-Fiene out of hand because it was based on Plaintiff's subjective allegations – the ALJ made plain that this factor was merely part of a calculus with other factors causing it to be discounted. Another of those factors the ALJ details is the lack of record support for these allegations, which the ALJ specifically asked Plaintiff's counsel to identify for him at hearing, and to which Plaintiff's counsel responded, "[o]utside of the presence of panic attacks and [Plaintiff's] reports of the panic attacks and how they affect her, there's very little [medical evidence] that speaks to [that]."

---

[13] At one point in her brief, Plaintiff asserts the following: "contrary to the ALJ's statement, Dr, Funasaki-Fiene explicitly opined that Plaintiff would not be able to sustain a full time job." [Dkt. 12, p. 14.] Plaintiff has again taken the ALJ's statement out of context. The ALJ did acknowledge, as just cited by the Court, that Dr. Funasaki-Fiene opined Plaintiff would be unable to sustain a full time job. Elsewhere in her opinion, the ALJ also pointed out that neither Dr. Funasaki-Fiene nor Dr. Bashir "opined *in their notes* that the claimant cannot work." [R. 21 (emphasis added.)] Which is also true.

[R. 44.] (Plaintiff does not now argue there is any non-subjective evidence of record in her favor, and neither the ALJ nor the Court found any.) Thus, it was reasonable for the ALJ's to conclude that Dr. Funasaki-Fiene's opinion Plaintiff was unable to leave her house due to crippling anxiety was inconsistent with many records that documented Plaintiff regularly engaged in a range of social activities. [R. 22.] Courts must defer to the ALJ when there is room for reasonable disagreement, and we do so here. *Elder*, 529 F.3d at 413.

Lastly, Plaintiff asserts that "the ALJ noted there were no GAF assessments to corroborate Dr. Funasaki's findings." [Dkt. 12, p. 15.] This is a misrepresentation of an exchange between the ALJ and her counsel at the hearing. In reality, the ALJ asked Plaintiff's counsel whether "any doctor during the course of treatment assessed the level of severity or imposed any limitations on your client" or issued "a Global Assessment of Functioning score?" [R. 45.] In response, Plaintiff's attorney responded he did not believe "any Global Assessment of that nature has been issued" and that the majority of the record consisted of Plaintiff's own reports to her doctors. *Id*. Thus, it was *Plaintiff's own attorney*, not the ALJ, who noted the lack of GAF scores in the record.[14] Regardless, Plaintiff makes no actual argument in relation to this point [dkt. 12, p. 15] and the Court will not make one for her. Moreover, the ALJ did not even cite this rationale in discounting Dr. Funasaki-Fiene's opinion. [R. 22]. This is not a reason for remand.

Ultimately, while the ALJ must provide "good reasons" for how much weight he gives to a treating source's medical opinion, the Seventh Circuit upholds "all but the most patently erroneous

---

[14] Ultimately, Plaintiff's counsel was wrong, and Dr. Funasaki-Fiene's July 9, 2018 Mental Residual Functional Capacity Statement assessed Plaintiff with a GAF of 45 and noted that Plaintiff's highest GAF within the prior year was 50. [R. 606.] However, Plaintiff does not cite any of Dr. Funasaki-Fiene's treatment notes that reflect any GAF scores for Plaintiff. It seems the ALJ was unable to find any either, and neither has the Court. *See Herrman v. Astrue*, 2010 WL 356233, at *12 (N.D. Ill. Feb. 1, 2010) (Judges are not "archaeologists consigned to excavating masses of paper in search of possibly revealing information that might benefit the party whose briefs provided no clue of where to dig.") (citing *Northwestern Nat. Insurance Co. v. Baltes*, 15 F.3d 660, 662-663 (7th Cir. 1994)); *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument.").

reasons for discounting a treating physician's assessment," which is "a very deferential standard." *Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009); 20 C.F.R. § 416.927(c)(2); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Elder*, 529 F.3d at 415. The Court finds the reasons detailed above are good reasons supported by the record for discounting the opinions of Dr. Funasaki-Fiene, and Plaintiff has not demonstrated that the ALJ's rationale was patently erroneous. The Court will not remand based on the ALJ's treatment of Dr. Funasaki-Fiene's opinion.

**4.      CONCLUSION**

Plaintiff's motion for summary judgment (dkt. 12) is DENIED and Defendant's motion for summary judgment (dkt. 21) is GRANTED. The Court affirms hereby the final decision of the Commissioner denying benefits.

**ENTERED: 3/24/2021**

Susan E. Cox,
United States Magistrate Judge